IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 23, 2003

## ANDREW LEE MOATS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 71959     Ray L. Jenkins, Judge**

---

**No. E2003-00402-CCA-R3-PC**
**October 9, 2003**

---

A Knox County jury convicted the Petitioner of first degree murder, and the trial court imposed a life sentence in the Tennessee Department of Correction. On direct appeal, this Court affirmed the conviction, and the Tennessee Supreme Court denied the Defendant's application for permission to appeal. The Petitioner then sought post-conviction relief, alleging that he was denied effective assistance of counsel. Following a hearing, the post-conviction court dismissed the petition, and this appeal ensued. We affirm the trial court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Albert J. Newman, Jr., Knoxville, Tennessee, for the appellant, Andrew Lee Moats.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Zane Scarlett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

Our Court summarized the underlying facts of the Petitioner's case on direct appeal as follows:

The state presented the following proof. Jeffery Mayes testified that he met the victim, Dallas Walker, at the victim's home two days prior to the victim's murder. Mayes received over five hundred dollars from the victim to purchase marijuana for the victim and Carl Neer. Mayes gave the defendant the money to purchase the marijuana. The defendant and Mayes attempted to obtain the marijuana,

but they were unsuccessful.

Richard Breeden testified that the day before the victim's murder, June 8, 1990, he talked to the victim about the victim's deal with the defendant. Breeden had recently traded his Jeep and an Intratec nine millimeter automatic pistol for the defendant's Lincoln Continental. Around dusk that evening, Breeden, the victim, Marlene Walker, Chuck Walker and Bill Cox went to the defendant's house in Breeden's Lincoln. The victim, the defendant and Mayes talked outside in front of the defendant's home. Breeden was unable to hear this conversation, but he testified that it was a very brief conversation and he saw no violent gestures. After this conversation, the five of them drove to Maynardville in search of the defendant's Jeep. Four hundred dollars was still owed on the Lincoln for which Breeden traded the Jeep; therefore, Breeden was unable to obtain a clear title to the Lincoln. They did not locate the defendant's Jeep, and they returned to Marlene Walker's home.

Breeden testified that the following morning, the victim and Carl Neer came to his house in the victim's creme-colored Ford Escort. The victim drove Neer and Breeden to the defendant's home to inquire about his money, but the defendant was not at home. In the afternoon, Mayes called Breeden and told him that they had half the victim's money, and they would obtain the other half by the end of the day. Mayes testified he told Breeden that the defendant had all the victim's money. Breeden notified the victim of the situation. The victim returned to Breeden's house with Carl Neer, and they drove to the defendant's home again. The victim parked his car at a Mrs. Winner's restaurant near the defendant's home. Mayes exited the defendant's home where he met Breeden near the street. Mayes told Breeden, who was carrying a .25-caliber gun, it would take another 30-45 minutes to obtain the victim's money. The victim and Breeden left, but Breeden returned to the defendant's house later to inquire about the victim's money. Mayes testified that he saw a nine millimeter gun laying in the passenger's seat of Breeden's Lincoln while he and Breeden were talking. Breeden testified that Mayes seemed very nervous during this meeting.

In addition to the meetings for which Breeden testified, Mayes testified about a meeting in Marlene Walker's driveway among Mayes, the victim and the defendant, which occurred on the night before or the day of the victim's murder. The victim asked Mayes about his money, and Mayes told the victim that the defendant had the money. The victim and the defendant discussed something calmly, but Mayes was unable to hear the conversation.

Carl Neer testified that he arrived at the victim's house around 8:30 p.m. on the evening of the murder. Neer testified that he was not there in the morning as Breeden had testified. Neer testified that he, the victim and Marlene Walker drove to Breeden's house in the victim's Ford Escort. The four of them went to the

defendant's house, Breeden knocked on the door, and Breeden returned to the car saying no one was there. They parked across the street from the defendant's house at a fast food restaurant. Neer described the meeting of Breeden and Mayes consistently with the testimony of Breeden and Mayes. The victim returned Breeden to his home and drove Marlene Walker and Neer to the victim's home.

Marlene Walker left the victim's home, but returned ten to fifteen minutes later. Walker told the victim that the defendant had returned home and suggested that the victim should go to the defendant's to retrieve his money. The victim and Neer drove to the defendant's home around 11:00 p.m. on June 9, 1990. Because the victim did not see the defendant's Jeep at the defendant's home, he decided to park in a parking lot near the defendant's home to watch and wait for the defendant. Neer testified that within five minutes a person exited the front door of the defendant's home. One to two minutes later, two more people exited the defendant's home. Neer saw a Jeep exit the defendant's home on a side street. The Jeep pulled in front of their car at an angle with the bright lights shining into the victim's car. The bright lights remained on the victim and Neer as they lifted their hands to cover their eyes. After ten to twelve seconds, the Jeep pulled door-to-door to the victim's car. According to Neer, the defendant, the driver in the Jeep, said the victim's name and asked the victim if the victim had been looking for him. Neer did not hear the victim say anything. The defendant had a shotgun placed across his lap. The victim and Neer did not have guns in their hands at this time, but there were two guns in the car which were visible. Neer testified that the defendant shot the victim in the face within seconds or minutes of placing his Jeep door-to-door with the victim's car. After bringing himself off the floorboard, Neer exited the vehicle with the .25-caliber gun and attempted to shoot at the Jeep. The gun would not discharge, and Neer threw it in a nearby yard.

Mayes was with the defendant when the victim was shot. Mayes testified that the defendant never talked about shooting someone that night. At first, Mayes testified that he saw the defendant put the shotgun in the Jeep a few minutes prior to the victim's shooting at the defendant's house. Mayes testified that the victim said something to the defendant before the defendant shot him, but Mayes could not hear the conversation. Upon cross examination, Mayes testified that the shotgun was already in the Jeep when he, the defendant and the defendant's girlfriend entered the Jeep. Additionally, Mayes confirmed his testimony in a prior proceeding that the defendant kept the shotgun in his Jeep most of the time. Mayes did not see the victim with a gun, but the defendant said the victim had a gun. Mayes's view into the victim's car was partially blocked by the defendant because Mayes was in the back seat of the Jeep. After shooting the victim, the defendant quickly drove away from the scene. The defendant or his girlfriend threw the shotgun out of the Jeep. The defendant drove himself, his girlfriend and Mayes into Kentucky, but they returned a couple of days later.

State v. Moats, No. 03C01-9805-CR-00184, 1999 WL 595417, at *1-3 (Tenn. Crim. App. Aug. 10, 1999).

A Knox County jury convicted the Petitioner of first degree murder on December 3, 1997, and the trial court imposed a sentence of life imprisonment.[1] This Court affirmed the conviction on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. On January 24, 2001, the Petitioner filed a pro se post-conviction petition. On February 2, 2001, the post-conviction court appointed Albert Newman to represent the Petitioner in this post-conviction matter. Newman filed an amendment to Petitioner's original petition for post-conviction relief on February 20, 2001. In his petition, the Petitioner asserted that he should be granted post-conviction relief based upon numerous theories, including ineffective assistance of counsel. The post-conviction court conducted a hearing on the petition, as amended, on February 13, 2003. At the evidentiary hearing, the Petitioner made an oral motion to withdraw all allegations in his petition except for the allegation of ineffective assistance of counsel, which the post-conviction court granted. After hearing the evidence, the post-conviction court dismissed the petition. The Petitioner filed a timely notice of appeal.

The following evidence was presented at the post-conviction hearing: The Petitioner testified that from the time his trial counsel, Jeff Whitt ("Counsel"), was appointed to the time his second murder trial commenced, he met and discussed his case with Counsel approximately six to eight times. The Petitioner stated that he believed that Counsel was familiar with his case at the time. The Petitioner testified that he and Counsel decided that they would go with the theory of self-defense at trial, because of "the way they hunted me down and everything." The Petitioner explained that he told Counsel that he "wanted to take the stand." However, the Petitioner did not testify at trial. He stated that he was sworn in at the beginning of the trial, but he never took the stand. The Petitioner explained, "I don't know how–I don't know what happened to make it where I couldn't. It just–everything moved so quick. . . . I don't know why I didn't get to testify."

The Petitioner stated that had he testified at his murder trial, "I would have told them the truth. I'm innocent of murder . . . [b]ased on self-defense." The Petitioner reported that nobody testified on his behalf at the trial. However, he stated that he knew of a witness, Marlene Walker, who "was a very important person on this case and could have testified in my behalf." The Petitioner testified that "[s]he was a hostile witness, yes, but she was one that could prove that them people had plotted and planned to kill me before [the shooting] ever happened." The Petitioner stated that Counsel knew about this witness but never called her to testify. The Petitioner testified that "I looked around the courtroom two or three times when we was going through trial, and I never s[aw] her." Petitioner testified that he remembered something about a plea agreement with the State, "but

_____

[1]The Petitioner was previously convicted of first degree murder for shooting and killing the victim after a trial in 1991, but that conviction was reversed on appeal on May 2, 1994 and remanded for a new trial. On September 11, 1995, the Tennessee Supreme Court affirmed the reversal by this Court. State v. Moats, 906 S.W.2d 431, 435-36 (Tenn. 1995). The Petitioner was subsequently retried and convicted of first degree murder on December 3, 1997. Moats, 1999 WL 595417, at *3.

we never did go into it, because we [were] too busy working on the case." The Petitioner stated that he did not know whether he would have taken a plea bargain because "[i]t depends on the circumstances and what it was."

Counsel testified at the post-conviction hearing that he practices criminal law exclusively in Knox County and was appointed to represent the Petitioner. Counsel stated that he accepted the appointment because of his prior involvement in the Petitioner's first murder trial. Counsel testified that at the Petitioner's first murder trial, he sat second chair and assisted the Petitioner's trial counsel. Counsel stated that "I ordinarily don't do appointed work. I've probably done three appointed cases in my life, but I very much wanted to represent [the Petitioner]." Counsel testified that he wanted to represent the Petitioner because of his prior involvement in the first murder trial. Counsel stated that he met with the Petitioner about six to eight times prior to the second murder trial. Counsel testified that he was "totally familiar with the case" and ready to go to trial. Counsel stated that prior to the commencement of the trial, he discussed with the Petitioner whether the Petitioner would testify at trial. Counsel explained that:

> As a matter of fact, when I took this case, one of the things that I had told [the Petitioner] before was–from the first trial, was perhaps maybe if he would testify it may have helped our cause; and that's one of the things that we looked at doing for the second trial, was one of my goals going into the case, that I thought that would be a good thing. So, yes, we did discuss it before the trial.

Counsel reported that before the trial started, he and the Petitioner "were certainly leaning in [the] direction" of having the Petitioner testify.

Counsel testified that after the State put on its case, he changed his mind about the Petitioner testifying. Counsel explained:

> What . . . changed my mind during the trial was the proof as it came in in 1991 was nowhere near what came in in 1997. The witnesses that testified were absolutely inconsistent. As a matter of fact, I don't know how many times I would have sat there from that–stood there from that podium and, basically, read back previous statements to all the witnesses that were testifying. [I]t was awful, as far as their recollection and their different stories that they presented, both Mr. Breeden, Mr. Neer, all those fellows. So, yes, that certainly was a surprise to me that they would testify that inconsistently, and it certainly gave me a different view of the case.

Counsel testified that after the State's proof, he met with the Petitioner, the Petitioner's father, and his co-counsel on the case to discuss whether the Petitioner should testify. Counsel stated that:

> [W]e talked about it, and, basically, I initiated the conversation and I told [the Petitioner], I said, 'Well, we've got to make our decision now.' Of course, [the Petitioner] had–had wanted to testify in the past. There was no–there was no

question about that. But he asked me what I thought and what we thought together, both [my co-counsel] and I. And my opinion at that time was for [the Petitioner] not to testify, and the reason why that was is because I thought the proof had come in so poorly, that the only thing that we could do is probably hurt ourself. Because, once again, there was no consistency in any of the State's witnesses. So I thought at that time that would be the right thing to do. I explained that to [the Petitioner]. I explained that to his father. . . . [Co-counsel] reported to me that he was . . . not confident in [the Petitioner's] ability to testify and help himself. So our fear was at that time, right before it was our time to put on our proof, that–that potentially we could hurt ourself, but with the proof coming in the way it did, we didn't need to take that chance. [The Petitioner] asked me what I thought, and that's –that's what I told him.

Counsel explained that the decision to testify "was ultimately [the Petitioner's] decision." Counsel stated that "he trusted me to do what I thought was the right decision, and what I thought the right decision was was not to testify." Counsel testified that he did not put anything in the trial record regarding the fact that the Petitioner did not want to testify on his own behalf. Counsel stated that after the conviction, in hindsight, he told the Petitioner, "I should have put you on."

Counsel testified that he advised the Petitioner not to testify in part because "there was proof that would come in, as far as some priors. [The petitioner] had some lengthy criminal history that would have come in." Counsel stated that once the Petitioner made the decision not to testify, he did not put on any defense proof because the State's case was so bad. Counsel testified that he could remember the name Marlene Walker but could not remember who she was or what her relationship was to the Petitioner's case. Counsel stated that Marlene Walker "would not have been anyone that I would have subpoenaed to testify."

Counsel testified that the State made an offer of second degree murder, but the Petitioner refused to plead guilty. Counsel explained that the Petitioner stated, "I swore on my mother's grave that I wasn't going to plead to anything that I didn't do."

Following this evidence, the trial court concluded as follows:

The Court is of the opinion that [Counsel] has fully discharged his duties as counsel to this petitioner. That this Court has seldom seen such a vigorous defense. Counsel far exceeded the requirements of Baxter v. Rose, 523 S.W.2d 930, as well as Strickland v. Washington, 466 U.S. 668. The defendant/petitioner, likewise, has the burden of proving any allegations with regard to ineffective assistance of counsel by clear and convincing proof . . . . This the defendant has clearly failed to do. In conclusion, it is the judgment of the Court that the petition is not borne out by the proof, and it is dismissed.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203 (1997). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). A post-conviction court's factual findings are subject to a <u>de novo</u> review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. <u>Fields v. State</u>, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely <u>de novo</u> review by this Court, with no presumption of correctness. <u>Id.</u> at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to <u>de novo</u> review. <u>State v. Burns</u>, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. <u>Id.</u>; <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. <u>Burns</u>, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. <u>Baxter</u>, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. <u>Id.</u> at 687; <u>Cooper v. State</u>, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. <u>Strickland</u>, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." <u>Id.</u> at 694; <u>see also</u> <u>Harris v. State</u>, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. <u>Strickland</u>, 466 U.S. at 690; <u>State v. Mitchell</u>, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. <u>Strickland</u>, 466 U.S. at 690; <u>Cooper</u>, 849 S.W.2d at 746; <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Burns</u>, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. <u>Williams v. State</u>, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

On appeal, the Petitioner argues that the post-conviction court erred by finding that the Petitioner was not denied effective assistance of counsel. Specifically, the Petitioner argues that Counsel's statement to the Petitioner following his conviction, "I should have put you on," shows

by clear and convincing evidence that it was Counsel's unilateral decision to not have the Petitioner testify "that was the reason [the Petitioner] was prevented from testifying, which testimony could have changed the outcome of the trial."[2]  We disagree with this assertion.

While the Petitioner stated that he did not know why he did not testify at his murder trial, Counsel gave a detailed account regarding why he and his co-counsel decided to advise the Petitioner not to testify.  Counsel explained that while he had originally planned on the Petitioner testifying at the beginning of the trial, once the State put on its witnesses and evidence, he felt that the Petitioner should not testify.  Counsel explained that "I thought the proof had come in so poorly, that the only thing that we could do is probably hurt ourself."  Indeed, Counsel recognized that the Petitioner's testimony would be impeached with his "lengthy criminal history."  Furthermore, Counsel explained that his co-counsel informed him that he was not confident in the Petitioner's ability to testify and help himself on the stand.  Counsel testified that he met with the Petitioner, along with his co-counsel and the Petitioner's father, in order to give his advice and allow the Petitioner to make a decision about testifying at his trial.  Counsel testified that the decision to testify "was ultimately [the Petitioner's] decision."[3]

Counsel stated that after the Petitioner's conviction, he told the Petitioner, "I should have put you on."  Counsel explained that he told the Petitioner this in hindsight.  This statement by Counsel does not show by clear and convincing evidence that it was Counsel's unilateral decision to not have the Petitioner testify.  Indeed, the evidence overwhelmingly shows that the Petitioner made the decision not to testify after being advised by Counsel.  The evidence shows that Counsel advised the Petitioner not to testify based upon inconsistencies in the State's evidence, the Petitioner's lengthy criminal history, and the Petitioner's inability to help himself on the stand.  Counsel's trial strategy of advising the Petitioner not to testify "falls within the wide range of reasonable professional assistance."  Burns, 6 S.W.3d at 462.  Certainly, in hindsight, Counsel may have changed his trial strategy and advised his client to testify.  However, in the heat of a first degree murder trial, Counsel made a well-reasoned judgment call regarding whether to have the Petitioner testify.  We will not deem Counsel to have been ineffective merely because a different procedure or strategy might have produced a different result.  Williams, 599 S.W.2d at 279-80.  Furthermore, the Petitioner has failed to prove that Counsel's performance prejudiced his defense, resulting in a failure to produce a reliable result.  Strickland, 466 U.S. at 687; Cooper, 849 S.W.2d at 747.  Accordingly, we find that the Petitioner has failed to prove ineffective assistance of counsel by clear and convincing evidence.

_____

[2]We note that the Petitioner raised two additional issues during the post-conviction hearing regarding ineffective assistance of counsel: (1) failure of Counsel to call the witness Marlene Walker to testify; and (2) failure of Counsel to advise the Petitioner of a potential plea bargain with the State.  However, the Petitioner failed to raise these issues in his appellate brief.  As a result, the Petitioner has waived these issues. Tenn. R. App. P. 13(b); Nichols v. State, 90 S.W.3d 576, 607 (Tenn. 2002).

[3]Counsel did not make a record of the Petitioner's waiver of his right to testify at trial, which is now required by Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999).  However, this procedural requirement was not a new constitutional rule that required retroactive application. Id. at 162-63.  Therefore, the Momon procedural requirement is inapplicable to this case because the Momon decision was filed after the Petitioner's murder trial.

Thus, we conclude that the post-conviction court properly found that the Petitioner failed to prove ineffective assistance of counsel by clear and convincing evidence and that Counsel fully discharged his duties as the Petitioner's attorney. Accordingly, the judgment of the post-conviction court is AFFIRMED.

 

 

_____
ROBERT W. WEDEMEYER, JUDGE